UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
W. ROBERT CURTIS, ESQ.,

                            Plaintiff,

                - against -

TERESA P. GREENBERG, ESQ., THE
LAW OFFICE OF YEUNG & WANG,
PLLC, WILLIAM J. LARKIN, III, ESQ.,
LARKIN,          INGRASSIA,          &
TEPERMAYSTER, LLP, TODD    A.
KELSON, ESQ., TODD A. KELSON, PC,
MISHAEL M. PINE, ESQ., RONALD A.
BERUTTI, ESQ., WEINER LAW GROUP,
LLP, JEFFREY SALTIEL, ESQ., WENIG,
SALTIEL, LLP, GREGORY SHEINDLIN,
ESQ., SHEINDLIN LAW OFFICE, and
NILOUFER BASSA,

                            Defendants.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
20-CV-824 (PKC) (LB)

PAMELA K. CHEN, United States District Judge:

Plaintiff, an attorney proceeding *pro se*, filed the Second Amended Complaint ("SAC") in this case on July 27, 2020.  The SAC alleges violations of state law and the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1962(c) and (d), by Defendants Teresa Greenberg, Esq. and the Law Office of Yeung & Wang, PLLC (collectively, the "Greenberg Defendants"); William Larkin, III, Esq. and the law firm Larkin, Ingrassia, & Tepermayster, LLP (collectively, the "Larkin Defendants"); Todd Kelson, Esq. and the law firm Todd A. Kelson, PC (collectively, the "Kelson Defendants"); Ronald Berutti, Esq. and the Weiner Law Group, LLP (collectively, the "Berutti Defendants"); Jeffrey Saltiel, Esq. and the law firm Wenig Saltiel, LLP (collectively, the "Saltiel Defendants"); Gregory Sheindlin, Esq. and the Sheindlin Law Office (collectively, the "Sheindlin Defendants"); Mishael M. Pine, Esq.; and Niloufer Bassa.

1

The 103-page, two-volume SAC essentially alleges that Defendants took advantage of Plaintiff's alcohol abuse and consequent incapacity to deprive him of his property and assets. It asserts that Defendants misled New York courts about Plaintiff's need for a court-appointed guardian and then, when a guardian was appointed, sought to manage Plaintiff's assets against his interests without his interference.

Defendants move to dismiss the SAC in its entirety. Finding that the SAC does not adequately allege any RICO violations, the Court dismisses Plaintiff's RICO claims with prejudice. Because the RICO claims are the only federal causes of action the SAC invokes, the Court declines to exercise supplemental jurisdiction over the remaining claims and dismisses the state law causes of action without prejudice to refile in state court.

## BACKGROUND

### I.    Factual Background

The SAC alleges the following facts, which the Court accepts as true for purposes of Defendants' motions. *See Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 429 (2d Cir. 2012).

Plaintiff is an attorney who operated a law firm, Curtis & Associates, PC, until 2016. (SAC Volume I ("SAC I"), Dkt. 52, ¶¶ 1–2.) Plaintiff's firm was in a "store-front townhouse located on [155] Duane [Street], in Tribeca, [New York]" (the "Duane Street Property"). (*Id.* ¶ 1.) In January 2016, Plaintiff retained the Greenberg Defendants to exchange the Duane Street Property for a "real property of like kind" under Section 1031 of the Internal Revenue Code, *see* 26 U.S.C. § 1031(a)(1), to allow Plaintiff to delay paying capital gains taxes on the Duane Street Property. (*Id.* ¶¶ 6, 10, 13–14.) The Duane Street Property sold for "approximately $7.7 million," and Defendant Greenberg, an attorney at Yeung & Wang, PLLC, arranged an exchange for a property in Brooklyn, New York (the "Brooklyn Property"). (*Id.* ¶¶ 6, 20.) On February 16, 2016,

Greenberg purchased the Brooklyn Property on Plaintiff's behalf for $3.5 million.  (*Id.* ¶ 21.)  At the time, Plaintiff was unaware that the Brooklyn property had various structural defects such that "its assessed value was in fact $448,458."  (*Id.* ¶ 25B.)

On November 1, 2016, Plaintiff retained the Larkin Defendants.  (*See* Retainer Agreement, Dkt. 95-3, at 7.[1])  The Larkin Defendants represented Plaintiff in revoking his prior will.  (SAC I, Dkt. 52, ¶ 43.)  They also represented Plaintiff in family court proceedings against a former girlfriend.  (*See id.* ¶ 52.)

At some point in 2016, Plaintiff "became incapacitated and unable to function effectively, having lost some short-term memory skills because of the abuse of Lagavulin, a single-malt scotch."  (*Id.* ¶ 2.)  On February 20, 2017, Plaintiff admitted himself to an alcohol treatment program.  (*See id.* ¶ 262.)

Around March 13, 2017, the Larkin Defendants commenced a proceeding on behalf of Plaintiff's daughter under Article 81 of the New York Mental Hygiene Law, seeking to have a guardian appointed for Plaintiff.  (*Id.* ¶ 59.)  In a guardianship proceeding, Justice Robert A. Onofry of the Supreme Court of New York appointed a Court Evaluator to prepare a report about Plaintiff, and the Kelson Defendants as counsel for Plaintiff.  (*See id.* ¶ 64.)  Defendant Kelson "specialized in Article 81 proceedings."  (*Id.* ¶ 88.)  On April 19, 2017, Justice Onofry appointed

---

[1] Although the SAC does not allege the date of the retainer, the Court may consider the agreement insofar as the SAC alleges breach of contract against the Larkin Defendants.  *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230–31 (2d Cir. 2016) (noting that a court may consider "any written instrument . . . incorporated in [the complaint] by reference" or "where the complaint relies heavily on its terms and effect," such as a "contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls" (citation and quotations omitted)).

Defendant Pine as Plaintiff's temporary guardian.  (*See id.* ¶¶ 24, 105; *see also* Affirmation of Mishael M. Pine, Dkt. 85-25, ¶ 1; Interim Order, Dkt. 85-27.)[2]

After meeting with Plaintiff and speaking with Larkin and Plaintiff's daughter, the Court Evaluator submitted a report to Justice Onofry.  (SAC I, Dkt. 52, ¶ 68.)  According to Plaintiff, the report contained false statements.  (*See id.* ¶ 68A–H.)

On June 29, 2017, Larkin and Kelson "presented Justice Onofry with a pre-prepared" proposed order including "[f]indings of [f]act, [c]onclusions of [l]aw, and [j]udgment."  (*Id.* ¶ 73.) Justice Onofry adopted the order, finding that Plaintiff had consented to the appointment of a guardian for an indefinite duration.  (Findings of Fact, Conclusions of Law and Judgment, ("Guardianship Order"), Dkt. 52-8, at ECF[3] 2–4.)[4]

Justice Onofry directed Larkin, Kelson, and Pine to "use Plaintiff's existing funds to pay for [Plaintiff's] living expenses" in light of a fire having recently destroyed the house on one of Plaintiff's properties, known as "Landmark Farm."  (SAC I, Dkt. 52, ¶¶ 38, 67.)  Plaintiff told Larkin that he had "decided to rebuild his home at Landmark Farm with the insurance proceeds." (*Id.* ¶ 268.)

---

[2] Although the SAC alleges that Defendant Pine was appointed on March 23, 2017 (SAC I, Dkt. 52, ¶ 105), exhibits Plaintiff attached to his opposition to Defendants' motions to dismiss show that Pine was appointed on April 19, 2017 (*see* Affirmation of Mishael M. Pine, Dkt. 85-25, ¶ 1; *see also* Interim Order, Dkt. 85-27).

[3] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[4] Plaintiff alleges that he did not consent to appointment of this guardian, and that Justice Onofry relied on false information.  (*See, e.g.*, SAC I, Dkt. 52, ¶ 73; *see also* Guardianship Order, Dkt. 52-8, ECF 2–4.)  Plaintiff also alleges, however, that "[b]y email on November 23, 2018," more than a year after the date he alleges his consent was fabricated, he "formally withdrew his consent for Pine to act as his Guardian and directed Kelson to seek [Pine's] termination for cause." (Second Amended Complaint Part II, Dkt. 52-1, ¶ 347.)

According to the SAC, the Larkin Defendants committed various acts of misconduct during the time they represented Plaintiff, most relevant of which are: (1) "intentionally deceiv[ing] [Justice Onofry about Plaintiff's medical condition] to obtain [the court's] authority," (2) sabotaging Plaintiff's recovery, (3) failing to adequately litigate Plaintiff's various cases, (4) attempting to liquidate Landmark Farm against Plaintiff's request, and (5) withholding documents from Plaintiff establishing this alleged misconduct.  (*See id.* ¶¶ 80, 82A–M.)

The SAC alleges that the Kelson Defendants committed various acts of misconduct, primarily: (1) "[d]eceiv[ing] [Justice Onofry] regarding Plaintiff's continuing, and then full recovery," (2) "conceal[ing] material facts from Plaintiff regarding estate operations and expenditures," (3) [l]iquidat[ing] Landmark Farm against the wishes and instruction of Plaintiff,"[5] (4) billing Plaintiff excessively, and (5) otherwise failing to pursue Plaintiff's interests as his representatives.  (*See id.* ¶ 101A–B.)

In February 2018, Plaintiff retained the Berutti Defendants.  (*Id.* ¶¶ 143–44.)  The Berutti Defendants replaced the Larkin Defendants as counsel in Plaintiff's personal litigation matters "because [Larkin had a] conflict of interest."  (*Id.* ¶ 144; *see also* SAC Volume II ("SAC II"), Dkt. 52-1, ¶ 318.)   In one of the cases the Berutti Defendants litigated on Plaintiff's behalf, Berutti negotiated a settlement with the Sheindlin Defendants.  (*See* SAC I, Dkt. 52, ¶ 151; SAC II, Dkt. 52-1, ¶ 492.)

According to the SAC, the Berutti Defendants (1) failed "to include [Plaintiff] in all material decision-making," (2) falsely claimed "Plaintiff was not fully recovered in May of 2018,"

---

[5] Plaintiff admits that he "signed an acknowledgment prepared and e-mailed by Kelson, stating that it was in his best interest to sell Landmark Farm," but alleges that Kelson coerced this consent by threatening to withdraw as his attorney otherwise.  (*See* SAC Volume II, Dkt. 52-1, ¶ 357.)

(3) concealed information from Plaintiff about judicial proceedings, (4) "ignored the instruction from Plaintiff and his son not to seek the appointment of a Receiver" for the Brooklyn Property, (5) mismanaged Plaintiff's litigations, and (6) "presented fraudulent bills to Pine and the Court." (*Id.* ¶ 141.)

On June 14, 2018, a New York state court appointed Defendant Saltiel as "Receiver and manager of [t]he Brooklyn Property."  (*Id.* ¶ 159.)  Saltiel "repeatedly refused Plaintiff entry to [t]he Brooklyn Property to prepare its seven units for rental" (*id.* ¶ 160) and failed to make repairs on the property despite taking "$18,646 from Plaintiff's estate identified for stated repairs" (*id.* ¶ 161).  Saltiel, Berutti, and Pine then "engaged in a lengthy phone conference, upon information and belief, to plan the liquidation of [t]he Brooklyn Property."  (SAC II, Dkt. 52-1, ¶ 533N.)  The liquidation was "stopped because Plaintiff is an attorney."  (SAC I, Dkt. 52, ¶ 7D.)

On January 17, 2019, Justice Onofry terminated Plaintiff's guardianship.  (SAC II, Dkt. 52-1, ¶ 468.)  Plaintiff "obtained possession of [t]he Brooklyn Property in May of 2019," at which point he discovered various defects such as "backflow for the sewer" and incomplete construction on aspects of the building, among other issues.  (SAC I, Dkt. 52, ¶ 32A–L.)

In July 2019, Plaintiff hired Defendant Bassa as an administrative assistant.  (*See id.* ¶¶ 169–172.)  Bassa temporarily moved into a vacant apartment in the Brooklyn Property that Plaintiff owned.  (*See id.* ¶ 178.)  Without Plaintiff's knowledge, Bassa remained in the apartment longer than he had offered to allow her to stay, during which time she did not pay rent.  (*See id.* ¶¶ 166, 183–185.)  Plaintiff also discovered that Bassa was working on a personal real estate business.  (*See id.* ¶¶ 183–185.)  Plaintiff fired Bassa in September 2019 (*id.* ¶ 186), at which point she "compos[ed] several e-mails and sen[t] copies of them to Judge [sic] Onofry making utterly

6

false statements to support of the [sic] Berutti and Kelson applications to have Pine re-appointed as guardian for Plaintiff (*id.* ¶ 195; *see also* SAC II, Dkt. 52-1, ¶ 483).[6]

## II.    Procedural Background

On February 14, 2020, Plaintiff filed a 145-page complaint with a 161-page exhibit attached, raising claims against Defendants under RICO and state law.  (*See* Dkt. 1.)  After a telephone conference before Magistrate Judge Lois Bloom, Plaintiff filed a 133-page amended complaint with 32 attached exhibits.  (*See* Dkts. 26, 32.)  Several defendants moved for a pre-motion conference regarding potential motions to dismiss, invoking the requirement of Federal Rule of Civil Procedure 8(a) that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2).  (*See* Dkts. 37, 38, 39, 41.)  On June 25, 2020, Judge Bloom held another telephone conference in which she advised Plaintiff that she would "give [him] another try" to "make it so [the complaint is] not 133 pages, and as confusing as it is."  (Dkt. 46, at 7:4–6.)  On July 27, 2020, Plaintiff filed the SAC, which is 103 pages, contains over 582 paragraphs, and has 28 attached exhibits.  (*See* SAC I, Dkt. 52; SAC II, Dkt. 52-1; Dkts. 52-2–52-29.)[7]

---

[6] According to the SAC, numerous independent actors, many of them hired by Plaintiff, committed various deceitful acts against him.  For example, Plaintiff alleges that he hired "David Rowe, Ph.D." to "conduct a full battery of psychological tests," which took place "months apart," to "fully understand the nature of the damage alcohol had caused to [Plaintiff's] brain."  (SAC II, Dkt. 52-1, ¶¶ 350–355.)  Without support, Plaintiff alleges that Dr. Rowe's "final report . . . was inaccurate" and that Kelson and Pine "misrepresent[ed] Plaintiff's actual condition" by "broadcast[ing] the testing results."  (*Id.* ¶¶ 354–55.)

[7] Several Defendants make a reasonable argument for dismissal of the current 103-page, 582-paragraph SAC under Federal Rule of Civil Procedure 8(a).  *See, e.g.*, *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) ("When a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative or in response to a motion by the defendant, to strike any portions that are redundant or immaterial, or to dismiss the complaint." (citation omitted)); *Blakely v. Wells*, 209 F. App'x 18, 20 (2d Cir. 2006) (summary order) (concluding that "[t]he District Court acted within the bounds of permissible discretion in dismissing the second amended complaint for noncompliance with Rule 8(a)" because "[t]he

The SAC alleges that the various Defendants were involved in two "enterprises" under RICO. The first allegedly is composed of the Greenberg Defendants, a company called 1031 Vest, LLC, and an agency called Title Trak (collectively, "Alleged Enterprise 1"). (*See* SAC I, Dkt. 52, ¶¶ 11, 18, 19; SAC II, Dkt. 52-1, ¶ 496.) The second allegedly is composed of the Larkin Defendants, Defendant Pine, the Kelson Defendants, the Berutti Defendants, the Sheindlin Defendants, the Saltiel Defendants, and Defendant Bassa (collectively, "Alleged Enterprise 2"). (*See* SAC II, Dkt. 52-1, ¶¶ 515–19.)

Plaintiff claims that Alleged Enterprise 1 engaged in the following conduct:

A. Exploiting Plaintiff's incapacity by obtaining executed legal documents on the closing of [the Duane Street Property] and [t]he Brooklyn Property that was [sic] not in the interest of Plaintiff and when [he] was known to lack the capacity to execute them;

B. Taking $3 million from [Plaintiff] when implementing an IRS Section 1031 Exchange on behalf of Plaintiff;

C. Obtaining windfall profits in the form of fees, or some other pay-off, or "trade" of valuable services, from Brooklyn developers and contractors about which Plaintiff is yet to learn, with whom Defendants have on going [sic] relationships, from the assets obtained from the sale of [the Duane Street Property] for $7.7 million, and the payment of $3.5 million for [t]he Brooklyn Property even though construction was incomplete, many violations existed, and the building and land was valued at $448,458;

D. Causing Plaintiff to pay city and state transfer taxes of $109,078.22 at the closing of [t]he Brooklyn Property despite the fact that it is customarily a cost paid by seller;

E. Distracting Plaintiff by giving him $3,000,000 cash to become "look away money" and thus not completing 50% of the section 1031 Exchange as required; and

---

pleading, which spanned 57 pages and contained 597 numbered paragraphs, was far from short or plain"); *Kernan v. New York State Dep't of Fin. Servs.*, No. 13-CV-3196 (JS) (ARL), 2014 WL 1330679, at *1–2 (E.D.N.Y. Mar. 31, 2014) (dismissing a complaint that "span[ned] 115 pages and contain[ed] 467 paragraphs"). Even so, the Court considers whether the allegations state a claim on which relief may be granted, and finding that they do not, declines to dismiss the SAC under Rule 8(a), despite its plain lack of concision.

    F.   Improperly withholding, and perhaps spoliating, Plaintiff's case file in order to destroy evidence of Defendants [sic] wrongs.

(SAC II, Dkt. 52-1, at ¶ 500A–F.)

        Plaintiff alleges five "predicate acts":

A.   During the weeks prior to February 15, 2016, Greenberg and/or her firm sent several e-mails and letters scheduling the events related to the closing of [the Duane Street Property];

B.   During the week prior to February 16, 2016, Greenberg and/or her firm sent several e-mails scheduling the closing of [t]he Brooklyn Property;

C.   On February 17, 2016, Greenberg placed in the United States mail a letter to Sheindlin and the Law Office of Walter Jennings about her Attorney Trust Account;

D.   Other predicate acts that will be established when Greenberg delivers the bates-stamped file and privilege log that Defendants are now improperly withholding from Plaintiff;

E.   Greenberg placed in the U.S. Postal Service and sent numerous the e-mails [sic] set forth above, the most recently [sic] being in June of 2020 an e-mail to Plaintiff pretending she had not been effectively served.

(*Id.* ¶ 501A–E.)

        Plaintiff claims that Alleged Enterprise 2 engaged in the following conduct:

A.   Planning for the death of [Plaintiff] and the control of his assets for their own economic benefit through an unauthorized executrix;

B.   Obtaining the authority of the Court by deceit to execute the fraudulent schemes including converting the temporary guardianship into a permanent guardianship and obtaining a Receiver and property manager for [t]he Brooklyn Property against the wishes and instruction of Plaintiff;

C.   Making substituted decisions for [Plaintiff] against his and his sons' [sic] instructions and wishes, against the directions and wishes of Plaintiff including the actual liquidation of Landmark Farm and the planned liquidation of [t]he Brooklyn Property;

D.   Liquidating Landmark Farm quickly at half of its value to obtain assets to pay legal bills and costs against the wishes of Plaintiff and for the benefit of Defendants;

E.   Planning the liquidation of [an] escrow account to obtain assets to pay Defendants' legal fees against the instruction and wishes of Plaintiff;

F.  Setting priorities as attorneys for [Plaintiff] which were in their own financial interest and not in the interest of Plaintiff such as not pursuing the claims against Greenberg [and others] and concealed these decisions/priorities from Plaintiff;

G.  Actively interfered in [Plaintiff's treatment] such that Plaintiff's recovery during medical care and rehabilitation would not be achieved;

H.  Knowingly withheld contemporaneous legal papers and financial information from Plaintiff to impair his decision-making including Defendants' substituted decision not to amend the complaint to add [additional parties] in [one of Plaintiff's personal litigation matters];

I.  Executing an imprisonment of Plaintiff at [a facility called] The Landing At Poughkeepsie seeking certain death rather than rehabilitation;

J.  Knowingly presenting false invoices and false reports in concert to the Court; and

K.  Improperly withholding, and perhaps spoliating, Plaintiff's case files in order to destroy evidence of Defendants' wrongs.

(SAC II, Dkt. 52-1, ¶ 520A–K.)  Plaintiff also lists various communications that he alleges are "predicate acts."  (*See id.* ¶ 521A–R.[8])

In addition to the substantive RICO claims, Plaintiff alleges conspiracy to commit RICO violations, breach of contract, breach of fiduciary duty, common law fraud, and violations of New York General Business Law 349,[9] against various defendants.  (*See id.* ¶¶ 539–82.)  He also appears to allege a separate malpractice claim.  (*See, e.g., id.* ¶¶ 571–74.)  Each defendant has filed a motion to dismiss.  (*See* Dkts. 72, 90, 94, 98, 101, 106, 107, 108, 110, 112)  Plaintiff has replied

---

[8]  The SAC enumerates these allegations as sub-paragraphs "A" through "R" but omits letters "F" and "N," and lists letters "J" and "L" twice.  Additionally, sub-paragraph "R" is blank.

[9]  The Court assumes Plaintiff intends to invoke only Section 349, which governs "[d]eceptive acts and practices," *see* N.Y. Gen. Bus. Law § 349, even though he variously cites Sections 249 and 492 (*see, e.g.*, SAC II, Dkt. 52-1, ¶¶ 572 (this citation references the first of two paragraphs labelled "572" in the SAC), 581), which govern the "[l]ocation of privately-owned airports" and "[a]ccess to restroom facilities," respectively, *see* N.Y. Gen. Bus. Law §§ 249, 492.

to the motions to dismiss (*see* Dkt. 85) and attached 40 new exhibits to his reply (*see* Dkt. 85-1–85-40).

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation omitted).

Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted). "In addressing the sufficiency of a complaint, [the Court] accept[s] as true all factual allegations and draw[s] from them all reasonable inferences; but [the Court is] not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013).

"Typically, when a plaintiff proceeds without legal representation, the district court must regard that plaintiff's complaint in a more liberal light, affording the pleadings of a pro se litigant the strongest interpretation possible." *Sullivan v. IStoreGreen, LLC*, No. 14-CV-7163 (ENV) (RLM), 2015 WL 152902, at *1 (E.D.N.Y. Jan. 12, 2015) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 471 (2d Cir. 2006) (per curiam)). But when the plaintiff is an attorney, as here, "the Court is not obliged to read his

11

pleadings liberally." *Id.* (citing, among others, *Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010)).

## DISCUSSION

### I.   Civil RICO

#### A.  Legal Standards

Section 1962(c) of RICO prohibits "any person employed by or associated with any enterprise" affecting international or interstate commerce from participating "in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1964(c) of "RICO creates a private cause of action for 'any person injured in his business or property by reason of a violation of section 1962' of RICO." *Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 139 (2d Cir. 2018) (brackets omitted) (quoting 18 U.S.C. § 1964(c)). RICO thus permits injured parties to sue "individuals working for an 'enterprise' that commits certain predicate crimes that amount to a 'pattern of racketeering activity.'" *Reich v. Lopez*, 858 F.3d 55, 59 (2d Cir. 2017) (quoting 18 U.S.C. §§ 1962, 1964). Section 1962(d) imposes conspiracy liability on defendants who "agree[] to violate RICO's substantive provisions." *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018) (citation and quotations omitted).[10]  "To establish a civil RICO claim, a plaintiff must allege (1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity, as well as injury to business or property as a result of the RICO violation." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013) (citation and quotations omitted).

---

[10] A RICO conspiracy claim fails when "[t]he alleged conspiracy involve[s] an agreement to commit the same substantive RICO violations" that the court has "deemed insufficiently pled, and the plaintiffs have not alleged any further acts that, if carried out, would have satisfied RICO's requirement of a pattern of racketeering." *Williams*, 889 F.3d at 126.

1. <u>Enterprise</u>

"The existence of an 'enterprise'—one existing 'separate and apart from the pattern of activity in which it engages'—is a necessary element of a section 1962(c) violation." *D'Addario v. D'Addario*, 901 F.3d 80, 99 (2d Cir. 2018) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). "The RICO statute defines 'enterprise' as 'any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" *Id.* at 100 (quoting 18 U.S.C. § 1961(4)). "[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).

"[I]ndividuals who act 'independently and without coordination' may not be treated as part of a RICO association-in-fact." *D'Addario*, 901 F.3d at 101 (quoting *Boyle*, 556 U.S. at 947 n.4). "Proof that 'several individuals, independently and without coordination, engaged in a pattern of crimes listed as RICO predicates, is not enough to show that the individuals were members of an enterprise.'" *Id.* (alterations omitted) (quoting *Boyle*, 556 U.S. at 947 n.4). Nor may a plaintiff prove an enterprise on the basis that "various [d]efendants and subgroups agreed at different times to engage in various fraudulent schemes." *Id.* 101–02.

"The enterprise must be separate from the pattern of racketeering activity," *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004) (citing *Turkette*, 452 U.S. at 583), "and distinct from the person conducting the affairs of the enterprise," *id.* (citing, among others, *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161–62 (2001)). A complaint therefore must "detail [a] *course* of fraudulent or illegal conduct separate and distinct from the alleged predicate racketeering acts themselves." *Id.* at 174 (citation omitted).

2.      Pattern of Racketeering Activity

"An enterprise, in turn, engages in a pattern of racketeering activity when its members commit at least two racketeering acts . . . that both are related to one another and have a nexus to the enterprise (the so-called predicate acts)." *United States v. Delgado*, 972 F.3d 63, 79 (2d Cir. 2020) (citations, quotations, and alterations omitted), *as amended* (Sept. 1, 2020), *cert. denied sub nom. Anastasio v. United States*, 141 S. Ct. 1114 (2021).  Thus, "[t]o state a claim of a substantive RICO violation under § 1962(c), a plaintiff must allege, among other things, two or more predicate acts constituting a pattern of racketeering activity." *Butcher v. Wendt*, 975 F.3d 236, 241 (2d Cir. 2020) (citation and quotations omitted).

a.      Racketeering Activity

"Section 1961(1) sets forth an exhaustive list of predicate 'acts' that can constitute a pattern of 'racketeering activity,' including section 1341 and 1343 (mail and wire fraud, respectively)." *Williams*, 889 F.3d at 124.  "The mail fraud and wire fraud statutes prohibit a person who 'devised or intended to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises,' from using the mails or interstate or foreign wire facilities 'for the purpose of executing such scheme or artifice or attempting so to do.'" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 488 (2d Cir. 2014) (quoting 18 U.S.C. §§ 1341, 1343).[11]  Thus, "wire [and mail] fraud ha[ve] three elements: (1) a scheme to defraud, (2) money or property that is the object of the scheme, and (3) use of the wires [or mail] to further the scheme." *Empire Merchs., LLC*, 902 F.3d at 139 (citation omitted).  "The first element, the scheme to defraud, is measured by a nontechnical standard.  It is a reflection of

---

[11] "Because the mail fraud and the wire fraud statutes use the same relevant language, [courts] analyze them the same way." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (per curiam) (citation omitted).

moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." *Id.* (citations and quotations omitted). "To meet the second element, the plaintiff must show that the object of the scheme—'the thing obtained,' or to be obtained—is 'property in the hands of the victim . . . .'" *Id.* (quoting *Cleveland v. United States*, 531 U.S. 12, 15 (2000)). "[A]ny [mailing or] wire that 'is part of the execution of the scheme to defraud as conceived by the perpetrator at the time' satisfies the third element." *Id.* (brackets omitted) (quoting *Schmuck v. United States*, 489 U.S. 705, 715 (1989)). "Although the mailed or wired communication need not itself be fraudulent to violate [the fraud statutes], it must, by the terms of the statutory sections, be made in furtherance of the fraudulent scheme." *Crawford*, 758 F.3d at 488.

RICO claims alleging fraudulent predicate acts "are subject to the heightened pleading standards of [Federal Rule of Civil Procedure] 9(b), which requires that averments of fraud be 'stated with particularity.'" *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013) (brackets omitted) (quoting Fed. R. Civ. P. 9(b)). "To satisfy this requirement, a complaint must specify the time, place, speaker, and content of the alleged misrepresentations, explain how the misrepresentations were fraudulent and plead those events which give rise to a strong inference that the defendant had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." *Id.* (citation and quotations omitted). "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Crawford*, 758 F.3d at 489 (citation omitted).

"Rule 9(b) permits knowledge to be averred generally, but plaintiffs . . . still must plead the factual basis which gives rise to a strong inference of fraudulent intent." *United States v.*

*Strock*, 982 F.3d 51, 66 (2d Cir. 2020) (citation and quotations omitted).  "An inference is 'strong' if it is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 176–77 (2d Cir. 2015) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007)).  "The requisite strong inference of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Strock*, 982 F.3d at 66 (citation omitted).

Finally, under RICO, the "predicate acts must be the proximate cause of the alleged injury."  *Butcher*, 975 F.3d at 241 (citation and quotations omitted).  "This means that there must be some 'direct relation between the injury asserted and the injurious conduct alleged.'"  *Empire Merchs.*, 902 F.3d at 140 (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)).

b.   Pattern

To satisfy the "pattern" requirement, the predicate acts must "pose a threat of continuous criminal activity" and "be related to each other."  *Reich*, 858 F.3d at 59 (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).  The "continuity can be closed-ended or open-ended."  *Id.* at 60 (citing *H.J.*, 492 U.S. at 239).  "Criminal activity that occurred over a long period of time in the past has closed-ended continuity, regardless of whether it may extend into the future."  *Id.* (citing *H.J.*, 492 U.S. at 242).  "As such, closed-ended continuity is primarily a temporal concept, and it requires that the predicate crimes extend over a substantial period of time."  *Id.* (citations and quotations omitted).  "Predicate acts separated by only a few months will not do; [the Second] Circuit generally requires that the crimes extend over at least two years."  *Id.* (citations omitted).

"On the other hand, criminal activity 'that by its nature projects into the future with a threat of repetition' possesses open-ended continuity, and that can be established in several ways." *Id.* (quoting *H.J.*, 492 U.S. at 241). "Some crimes may by their very nature include a future threat, such as in a protection racket." *Id.* (citing *H.J.*, 492 U.S. at 242). "When the business of an enterprise is primarily unlawful, the continuity of the enterprise itself projects criminal activity into the future." *Id.* (citation omitted). But "[w]here an alleged RICO enterprise primarily conducts a legitimate business, there must be some evidence from which it may be inferred that the predicate acts . . . were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Crawford*, 758 F.3d at 488 (citation and quotations omitted).

While "multiple schemes are not required in all circumstances" to establish continuity, *GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 467 (2d Cir. 1995), "courts must take care to ensure that the plaintiff is not artificially fragmenting a singular act into multiple acts simply to invoke RICO," *Schlaifer Nance & Co. v. Est. of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997). And "[a]lthough continuity is primarily a temporal concept, other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists." *First Cap.*, 385 F.3d at 181.

In *First Capital*, the Second Circuit found that a single fraudulent scheme was insufficient to establish continuity despite consisting of multiple predicate acts. There, the plaintiffs alleged that the defendants (various members of a family, the family's attorney, and "related entities") violated RICO by creating an enterprise to fraudulently conceal assets from creditors and the bankruptcy court. 385 F.3d at 165–66, 180. The plaintiffs alleged that the defendants had violated

17

RICO by committing a string of fraudulent acts over several years, including making fraudulent transfers to prevent creditors from reaching assets, making false statements in connection with the bankruptcy proceeding, and filing a false bankruptcy petition. *Id.* at 166, 180.

"Notwithstanding [that the] bankruptcy case appear[ed] to remain[] open" at the time of the RICO suit, the Second Circuit affirmed the district court's dismissal of the complaint on the ground that the plaintiffs failed to plead a pattern of racketeering activity. *Id.* at 181. The Court explained that the scheme in question sought the fraudulent conveyance of one person's assets and thus was "inherently terminable." *Id.* at 180–81 (citation omitted). Although the defendants' fraudulent acts spanned more than two years, each predicate act of fraud "involved the same misrepresentations." *Id.* at 182. The Second Circuit therefore determined that the scheme lacked the requisite continuity to form a pattern of racketeering activity.

Similarly, in *Schlaifer Nance*, the Second Circuit affirmed dismissal of a RICO action where the plaintiff attempted to "artificially fragment[] a singular act into multiple acts." 119 F.3d at 98. There, the plaintiff alleged that the defendant fraudulently induced it into entering a licensing agreement. The complaint alleged various acts that the plaintiff claimed constituted a pattern of racketeering activity, including "fraudulently transferring [the plaintiff's] rights under the Agreement to others," "accepting advance payments from sublicensees knowing [the plaintiff] would not approve," "fabricating bases for the disapproval of the licensing of many products," "threatening to allege a known false claim of fraud against [the plaintiff]," and "revising history through misrepresentation, deceit, and perjury, to cover up a pattern of racketeering activity." *Id.* at 96–97. In finding that the plaintiff had failed to allege closed-ended continuity, the court concluded that there was only "one purportedly fraudulent act: the negotiation of the Agreement,"

18

and that "[t]he acts complained of . . . [were] subparts of the singular act, and not a 'pattern' of separate acts with an underlying purpose." *Id.* at 98.

**B.  Plaintiff Fails to State a Civil RICO Claim Against Any Defendant**

Plaintiff fails to state a RICO claim with respect to Alleged Enterprise 1 or Alleged Enterprise 2.  The Court addresses each in turn.

1.     Alleged Enterprise 1

As noted, Plaintiff characterizes Alleged Enterprise 1 as the Greenberg Defendants, 1031 Vest, LLC, and Title Trak.  (SAC I, Dkt. 52, ¶¶ 11, 18, 19.)  Plaintiff alleges that 1031 Vest, LLC is "a company owned and controlled by Greenberg" that "initially purchased [t]he Brooklyn Property."  (*Id.* ¶ 18.)  Title Trak is the agency that "provided the Certificate of Title to Plaintiff for [t]he Brooklyn Property."  (*Id.* ¶ 19.)

a.   Plaintiff Fails to Adequately Plead that Alleged Enterprise 1 is a RICO Enterprise

The SAC says nothing about a common purpose between the Alleged Enterprise 1 entities, the longevity of their alleged relationship, *Boyle*, 556 U.S. at 946, or whether they acted in coordination, *D'Addario*, 901 F.3d at 101 (citation omitted).  In fact, the SAC says nothing about 1031 Vest and Title Trak other than that they were involved in the Section 1031 exchange.  That the Greenberg Defendants allegedly initiated that exchange against Plaintiff's interests does not make all parties with whom the Greenberg Defendants interacted part of a criminal enterprise bent on stealing from Plaintiff.

And even if these three entities had coordinated to achieve such a goal, the SAC fails to suggest, let alone "detail[,] [a] *course* of fraudulent or illegal conduct separate and distinct from the alleged predicate racketeering acts themselves." *First Cap.*, 385 F.3d at 174 (citation omitted). By all appearances, Plaintiff lists 1031 Vest and Title Trak in the SAC just to invoke RICO.  But

Plaintiff's "conclusory naming of a string of entities does not adequately allege an enterprise." *Id.* at 175 (citations and quotations omitted).

        b.  <u>Plaintiff Fails to Adequately Plead that Alleged Enterprise 1 Engaged in a Pattern of Racketeering Activity</u>

Even if Alleged Enterprise 1 were an enterprise for RICO purposes, Plaintiff fails to identify "two or more predicate acts constituting a pattern of racketeering activity" in which Alleged Enterprise 1 engaged. *Butcher*, 975 F.3d at 241 (citation and quotations omitted).

First, Plaintiff's fraud allegations against Alleged Enterprise 1 all pertain to the Section 1031 exchange of the Duane Street Property for the Brooklyn Property. As the SAC alleges, "Greenberg was retained by Plaintiff in 2016 to handle the sale [of the Duane Street Property]" and arrange for a Section 1031 purchase of a replacement property, namely, the Brooklyn Property. (SAC I, Dkt. 52, ¶ 14.) The SAC summarizes Greenberg's alleged fraud—and purportedly by extension, the fraud of Alleged Enterprise 1—as follows:

> Greenberg executed the following fraudulent schemes through Enterprise I: (i) exploited Plaintiff's incapacity at that time, (ii) converted Plaintiff's assets obtained from [] the sale of [the Duane Street Property], (iii) took Plaintiff's assets during the closing on [t]he Brooklyn Property, (iv) paid $3,500,000 for the Brooklyn Property when its value was less than $500,000, (v) concealed incomplete construction at [t]he Brooklyn Property together with its numerous violations, (vi) misrepresented the rental role of [t]he Brooklyn Property, and (vii) concealed evidence of known wrongs by withholding Plaintiff's files created while acting simultaneously as attorney and broker.

(*Id.* ¶ 20.) All of Plaintiff's fraud allegations against Alleged Enterprise 1 pertain to the Section 1031 exchange, the single purpose for which Plaintiff retained Greenberg. The SAC thus describes a single act of fraud that cannot sustain a RICO claim, even if Alleged Enterprise 1 took multiple steps to perpetrate that fraud. *See, e.g.*, *Crawford*, 758 F.3d at 489 ("[M]ultiple acts of mail fraud in furtherance of a single episode of fraud involving one victim and relating to one basic transaction cannot constitute the necessary pattern." (citations and quotations omitted)); *cf. Persaud v. Bode*,

No. 04-CV-4475 (ARR), 2006 WL 1419397, at *5 (E.D.N.Y. Feb. 8, 2006) ("While plaintiff alleges that defendants sold him property to which they did not have title, initiated an unlawful foreclosure on his property and then fraudulently resold the property to plaintiff, these acts, if true, constitute one act of fraud."); *Schlaifer Nance*, 119 F.3d at 98 ("[C]ourts must take care to ensure that the plaintiff is not artificially fragmenting a singular act into multiple acts simply to invoke RICO.").

Further, the SAC's allegations of nearly contemporaneous acts to perpetrate a single fraudulent transaction fail the temporal element of the closed-ended-continuity test. According to the SAC, the closings on the Duane Street and Brooklyn Properties occurred within months, if not days of each other. The SAC notes that "[d]uring the weeks prior to February 15, 2016, Greenberg and/or her firm sent several e-mails and letters scheduling the events related to the closing of [the Duane Street Property]." (SAC II, Dkt. 52-1, ¶ 501A.)[12] And "[t]he date of the closing" of the Brooklyn Property, the second half of the Section 1031 exchange, "was February 16, 2016." (SAC I, Dkt. 52, ¶ 21; *see also* SAC II, Dkt. 52-1, ¶ 501B.) *See Reich*, 858 F.3d at 60 (quoting *H.J.*, 492 U.S. at 239); *see also id.* (noting that "[p]redicate acts separated by only a few months will not do," and that "[the Second] Circuit generally requires that the crimes extend over at least two years" to show closed-ended continuity (citations omitted)); *Gross v. Waywell*, 628 F. Supp. 2d 475, 494 (S.D.N.Y. 2009 ("[C]ourts in this Circuit have held repeatedly that allegations of RICO violations involving solely mail and wire fraud or little other variety in the predicate acts, a limited

---

[12] The deed for the Duane Street Property, which is publicly available, shows that it was transferred on January 15, 2016. *See* N.Y.C. Dep't. of Fin., Off. City Regis., Doc. ID No. 2016012000829001, available at https://a836-acris.nyc.gov/DS/DocumentSearch/DocumentImageView?doc_id=2016012000829001 (last visited Aug. 19, 2021). The Court takes judicial notice of the publicly-documented fact. *See, e.g.*, *Dixon v. von Blanckensee*, 994 F.3d 95, 102 (2d Cir. 2021) ("Under Federal Rule of Evidence 201, a 'court may judicially notice a fact that is not subject to reasonable dispute.'" (quoting Fed. R. Evid. 201(b)).

number of participants or victims, a discrete scheme with a narrow purpose or a single property—as opposed to complex, multi-faceted schemes—are generally insufficient to demonstrate closed-ended continuity, and thus to satisfy to [sic] 'pattern' element of a plausible RICO claim.")[13]

Nor does the SAC sufficiently allege open-ended continuity.  There are no allegations "from which it may be inferred that the [alleged] predicate [fraudulent] acts . . . were [Greenberg's] regular way of operating [her] business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity."  *Crawford*, 758 F.3d at 488 (citation and quotations omitted).  Plaintiff does not allege, for example, that the Greenberg Defendants ever engaged in similar conduct with respect to others.  *Cf. Williams v. Equitable Acceptance Corp.*, 443 F. Supp. 3d 480, 493 (S.D.N.Y. 2020) (finding a RICO claim sufficient, in part because the amended complaint "contain[ed] allegations of numerous individuals other than the [n]amed [p]laintiffs complaining about [the defendant's actions] that [were] consistent with the scheme alleged by plaintiffs").  Rather, the SAC suggests an "inherently terminable" scheme tied to a single real estate transaction.  *See First Cap.*, 385 F.3d at 180–81 (citation omitted).  Plaintiff therefore fails to allege a pattern under RICO.

Second, even if Plaintiff alleged a pattern under RICO, he does not adequately allege predicate acts of racketeering activity.  Plaintiff claims mail and wire fraud as predicate acts.  (SAC

---

[13] Plaintiff's allegation that Greenberg "[i]mproperly withh[eld], and perhaps spoliat[ed], Plaintiff's case file in order to destroy evidence of Defendants [sic] wrongs" (SAC II, Dkt. 52-1, ¶ 500F) does not create continuity, since it pertains to the same underlying allegation of fraud. *See, e.g., Schlaifer Nance*, 119 F.3d at 97–98 (finding a single fraudulent transaction despite the defendant's subsequent attempts at "revising history through misrepresentation, deceit, and perjury, to cover up a pattern of racketeering activity"); *see also GE Inv. Priv. Placement Partners II v. Parker*, 247 F.3d 543, 547, 550 (4th Cir. 2001) (explaining that the defendants' alleged fraud did not gain the "threat of continu[ity]" through their subsequent attempt "to conceal their fraud"); *Apparel Art Int'l, Inc. v. Jacobson*, 967 F.2d 720, 723 (1st Cir. 1992) (affirming dismissal of a RICO claim for failing to allege continuity despite identifying a subsequent "cover-up," because this was a "separate part[] of a single criminal episode").

II, Dkt. 52-1, ¶ 500 (claiming that Alleged Enterprise 1 engaged in "fraudulent schemes"); 18 U.S.C. §§ 1341, 1342 (requiring a "scheme or artifice to defraud").)   The SAC alleges that Greenberg misrepresented and concealed aspects of the Brooklyn Property's condition that diminished its value, causing Plaintiff to overpay.  (*See, e.g.*, SAC II, Dkt. 52-1, ¶ 500A–F.)  The SAC does not, however, suggest what misrepresentations or concealment efforts Greenberg made, let alone how they were fraudulent.  Even to the extent Plaintiff invokes a "complex civil RICO action[] involving multiple defendants" and thus need not plead "the temporal or geographic particulars of each mailing," he still must "delineate, with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme." *Aiu Ins. Co. v. Olmecs Med. Supply, Inc.*, No. 04-CV-2934 (ERK), 2005 WL 3710370, at *11 (E.D.N.Y. Feb. 22, 2005) (citations and quotations omitted).  Here, the SAC does not allege that Greenberg ever told Plaintiff anything inaccurate about the Brooklyn Property, let alone that any misrepresentations were material.  *See Weaver*, 860 F.3d at 94 (noting that "the [plaintiff] must also prove that the misrepresentations were material" (citation and quotations omitted)).  Nor does the SAC allege how Greenberg concealed material information.

Rather, the SAC asserts that Greenberg made a series of "horrific decisions" in buying the Brooklyn Property (SAC I, Dkt. 52, ¶ 25) and "obtain[ed] executed legal documents on the closing of [the Duane Street Property] and [t]he Brooklyn Property that was [sic] not in the interest of Plaintiff (SAC II, Dkt. 52-1, ¶ 500A.  These "horrific decisions" include "[s]elling [the] Duane [Street] Property for approximately $7.7 million without a plan to shelter all sale assets from capital gain taxes"; purchasing the Brooklyn Property for more than it was worth and without performing an adequate inspection; "requiring Plaintiff to pay" transfer taxes that should have been the obligation of the seller; and giving Plaintiff $3 million to "[d]istract" him.  (SAC I, Dkt. 52 ¶ 25A–

23

L; SAC II, Dkt. 52-1 ¶ 500E).   That Greenberg allegedly made these "horrific decisions" as Plaintiff's representative says nothing about whether she committed mail or wire fraud.   If anything, the SAC suggests Greenberg breached a contract or fiduciary duty.   But "[a] breach of contract does not amount to mail fraud."   *U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 660 (2d Cir. 2016) (citation omitted).[14]   Thus, none of the allegations in the SAC satisfy "the heightened pleading standards of Fed. R. Civ. P. 9(b)" with respect to Alleged Enterprise 1, *see Cohen*, 711 F.3d at 359, especially given that "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it," *Crawford*, 758 F.3d at 489 (citation omitted).[15]

Plaintiff also asserts that he "was medically impaired" when he signed the relevant documents and that "Greenberg welcomed the opportunity to have Plaintiff simply sign his name on each document."  (SAC I, Dkt. 52, ¶ 23.)  But the SAC includes no suggestion that Greenberg, let alone the others involved in Alleged Enterprise 1, knew he was incapacitated when they closed on the two properties.   In fact, the SAC and Plaintiff's Response bely that notion.   The SAC alleges that the second of the two closings—and thus the final crucial act in the alleged fraud—occurred on February 16, 2016.  (*Id*. ¶¶ 20–21.)  Yet, according to the SAC, Greenberg learned of Plaintiff's

---

[14] *See also Oriska Ins. Co. v. Avalon Gardens Rehab. & Health Care Ctr., LLC*, No. 18-CV-1030 (DNH), 2019 WL 4195267, at *11 (N.D.N.Y. Sept. 4, 2019) ("By all appearances, . . . this is a breach of contract action that Plaintiff is attempting to transform into a federal RICO case." (citation, quotations, and brackets omitted)), *appeal dismissed as moot*, 826 F. App'x 117 (2d Cir. 2020) (summary order); *Faryniarz v. Ramirez*, 62 F. Supp. 3d 240, 254 (D. Conn. 2014) ("Though styled as violations of federal law, Plaintiff's proposed civil RICO claims suggests in substance claims for breach of contract and common business tort.").

[15] Plaintiff admits that although Greenberg provided him with the relevant documents related to the closings, he "read no legal papers presented to him by Greenberg" before signing. (SAC I, Dkt. 52, ¶ 23.)

rehabilitation and detoxification from Defendant Pine, who was appointed Plaintiff's guardian after Plaintiff was deemed incapacitated in April 2017.  (*Id.* ¶¶ 24, 105; *see also* Plaintiff's Memorandum of Law in Opposition to Defendants' Motions to Dismiss ("Pl. Resp."), Dkt. 85, at 20 ("Pine learned she had become the Temporary Guardian for Plaintiff shortly after . . . April 19, 2017"); Dkt. 85-21.)  The SAC thus fails to allege that Greenberg had any idea that Plaintiff lacked mental capacity at the time of the closings—more than a year before his incapacity determination—let alone any desire to exploit his incapacity.  "Without such knowledge, Defendant [Greenberg] cannot have taken advantage of Plaintiff's illness[.]"  *See Dahlinger v. First Am. Specialty Ins. Co.*, No. 19-CV-20 (LEK) (TWD), 2020 WL 1511261, at *5 (N.D.N.Y. Mar. 30, 2020) (quotations and brackets omitted).

Plaintiff responds that "[w]hether Defendant Greenberg had constructive notice of Plaintiff's incapacity during the time of the two closings" and "whether [Greenberg] then exploited that fact for [her] own economic benefit must, in part, await the production of the Greenberg files and [] depositions."  (Pl. Resp., Dkt. 85, at 56.)  But Plaintiff does not allege any facts to support the theory that "Greenberg had constructive notice of Plaintiff's incapacity during the time of the two closings," and, as noted, the SAC suggests otherwise.[16]  Plaintiff is not entitled to discovery

---

[16] Plaintiff also notes that "the Hon. Maria G. Rosa determined that Plaintiff lacked substantial mental capacity in 2015 and 2016."  (Pl. Resp., Dkt. 85, at 52; *see also* Dkt. 52-2.)  But if Plaintiff means to suggest this provided Greenberg with constructive notice of his incapacity, that argument fails because Justice Rosa issued her decision in 2018.  (*See* Dkt. 51-2, at 10.)  That decision therefore could not have provided Greenberg with notice of Plaintiff's incapacity at the time of the closings in 2016.  To the extent Plaintiff is suggesting that Justice Rosa's decision shows that Plaintiff was, in fact, mentally impaired in 2015 and 2016, such that Greenberg should have recognized or suspected his incapacity at the time of the closings, the Court rejects that argument as sheer speculation that is insufficient from which to infer Greenberg's constructive knowledge.

to vindicate speculation. *See Loreley*, 797 F.3d at 176 (noting that a plaintiff cannot "base claims of fraud on speculation and conclusory allegations" (citation and quotations omitted)).[17]

  c. Plaintiff Fails to Adequately Plead a RICO Conspiracy by Alleged Enterprise 1

  Plaintiff's RICO conspiracy count with respect to Alleged Enterprise 1 also fails to state a claim.  The Section 1962(d) allegations are identical to the Section 1962(c) allegations except that the words "[c]onspired to" or "[c]onspiring to" precede each Section 1962(d) paragraph.  (*See* SAC II, Dkt. 52-1, ¶¶ 500A–F, 510A–F.)  Because "[t]he alleged conspiracy involved an agreement to commit the same substantive RICO violations [the Court has] deemed insufficiently

---

  [17] The Court also is skeptical that the SAC alleges facts to plausibly support "a strong inference of fraudulent intent."  *Strock*, 982 F.3d at 66 (citation and quotations omitted).  With respect to "motive . . . to commit fraud," *id.*, for example, Plaintiff fails to provide any reason—beyond speculation—as to what Greenberg stood to gain by misrepresenting the value of the Brooklyn Property.  Plaintiff even admits that "Greenberg engaged in these wrongful acts to achieve economic benefits in ways still not fully known to Plaintiff." (SAC I, Dkt. 52, ¶ 26.)  He then conjures up a theory that Greenberg "[o]btain[ed] windfall profits in the form of fees, or some other pay-off, or 'trade' of valuable services, from Brooklyn developers and contractors about which Plaintiff is yet to learn, with whom Defendants have on going [sic] relationships, from the assets obtained from the sale of [the Duane Street Property] for $7.7 million, and the payment of $3.5 million for [t]he Brooklyn Property." (SAC II, Dkt. 52-1, ¶ 500C.)  As noted, however, the "plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully," *Iqbal*, 556 U.S. at 678 (citation omitted), and the Court is "not required to credit conclusory allegations," *Rothstein*, 708 F.3d at 94.  Plaintiff's allegations regarding "windfall profits" or "some other payoff . . . about which [he] is yet to learn" plainly violate the principle that a plaintiff cannot "base claims of fraud on speculation and conclusory allegations." *Loreley*, 797 F.3d at 176 (citation and quotations omitted); *cf. Cont'l Petroleum Corp. v. Corp. Funding Partners, LLC*, No. 11-CV-7801 (PAE), 2012 WL 1231775, at *6 (S.D.N.Y. Apr. 12, 2012) (dismissing a RICO claim "although the Amended Complaint aver[red] generally that [the] defendants each 'derive[d] income from [the alleged fraudulent] activities,'" because "it [did] not support this claim with any factual allegation" and was "openly based on speculation, in that it state[d] that [the defendants'] salaries [were] 'possibly' derived from RICO violations"); *cf. also DNJ Logistic Grp., Inc. v. DHL Express (USA), Inc.*, No. 08-CV-2789 (DGT), 2010 WL 625364, at *7 (E.D.N.Y. Feb. 19, 2010) (dismissing a fraud-based RICO claim because the plaintiff "fail[ed] to allege any facts suggesting that the [allegedly fraudulent] statements were made with fraudulent intent," and merely "conclusorily allege[d] fraudulent intent at several points in the complaint").

pled, and [Plaintiff has] not alleged any further acts that, if carried out, would have satisfied RICO's requirement of a pattern of racketeering," the conspiracy claim also must be dismissed. *See Williams*, 889 F.3d at 126; *see also Lynn v. McCormick*, 760 F. App'x 51, 54 (2d Cir. 2019) (summary order) ("Here, the alleged conspiracy was an agreement to commit the same substantive RICO violations we have deemed insufficiently pled, so there was no agreement to violate RICO's substantive provisions.").

Thus, the SAC fails to state a civil RICO conspiracy claim against the Greenberg Defendants.

### 2.   Alleged Enterprise 2

As noted, Plaintiff claims that Alleged Enterprise 2 comprises the Larkin Defendants, the Kelson Defendants, Pine, the Berutti Defendants, the Sheindlin Defendants, the Saltiel Defendants, and Bassa.  Plaintiff asserts that Alleged Enterprise 2 "was incrementally and sequentially created by Larkin, Kelson, Pine, Berutti, and Saltiel over a period exceeding two years, and was operated by them for the purpose of improperly liquidating Plaintiff's real property" and "taking Plaintiff's money assets from through [sic] excessive and deceptive billing as his attorneys."  (SAC II, Dkt. 52-1, ¶ 515.)

#### a.   Plaintiff Fails to Adequately Plead that Alleged Enterprise 2 is a RICO Enterprise

Plaintiff fails to establish that the individual Defendants in Alleged Enterprise 2 "functioned as a unit," *First Cap.*, 385 F.3d at 174 (citation omitted), "existing 'separate and apart from the pattern of activity in which it [allegedly] engage[d],'" *D'Addario*, 901 F.3d at 99 (quoting *Turkette*, 452 U.S. at 583).  According to the SAC, the Larkin Defendants commenced the Article 81 proceeding on behalf of Plaintiff's daughter in 2017.  The Kelson Defendants and Pine became involved in the Article 81 proceeding when Justice Onofry appointed them to represent Plaintiff

and act as his guardian, respectively.  The SAC alleges that the Larkin Defendants, Kelson Defendants, and Pine used their respective roles in the Article 81 proceeding to deceive Justice Onofry about Plaintiff's capacity so they could deprive Plaintiff of his property and assets.  It concludes that "Larkin, with Kelson and Pine [] acted in secret . . . to obtain complete control of Plaintiff's assets and person" (SAC I, Dkt. 52, ¶ 73) by presenting "false facts" to Justice Onofry about Plaintiff (*id.* ¶ 76).

The Berutti Defendants became involved with Plaintiff when their law firm replaced the Larkin Defendants as Plaintiff's counsel in his personal litigation matters.  According to the SAC, Berutti then represented Plaintiff in various cases and "exploited the dysfunctional role of Pine when Kerlson [sic] failed to supervise his litigation on behalf of [Plaintiff] which included his decision to engage in unnecessary work and fraudulent billing tactics."  (*Id.* ¶ 148.)  The SAC alleges that once Plaintiff's guardianship ended, "Berutti and Kelson [] falsely claim[ed] that Plaintiff had elapsed [sic] and had returned to a state of incapacity to try to manipulate Justice Onofry into reappointing Pine as Guardian."  (*Id.* ¶ 176.)

Saltiel became involved with Plaintiff when the court in one of Plaintiff's litigations appointed him as Receiver and manager of the Brooklyn Property.  The SAC alleges that "Saltiel joined Defendants Kelson, Pine and Berutti in their fraudulent scheme to liquidate [t]he Brooklyn Property by preventing Plaintiff from obtaining possession of it against the instruction and desires of Plaintiff."  (*Id.* ¶ 159.)  It asserts that "Berutti, Pine and Saltiel engaged in a lengthy phone conference, upon information and belief, to plan the liquidation of [t]he Brooklyn Property."  (SAC II, Dkt. 52-1, ¶ 521L.)

Finally, the Sheindlin Defendants are attorneys who litigated a case against Plaintiff and engaged in settlement negotiations with Berutti (SAC I, Dkt. 52, ¶ 151; SAC II, Dkt. 52-1, ¶ 492),

and Bassa is Plaintiff's former employee and tenant who allegedly emailed Justice Onofry that Plaintiff had relapsed (SAC I, Dkt. 52, ¶ 195).

The only link between all these Defendants is that they were involved in legal proceedings that concerned Plaintiff at some point between 2016 and 2019. Some were Plaintiff's retained representatives (Larkin and then Berutti), some were involved with Plaintiff in court-appointed roles (Kelson, Pine, and Saltiel), one was an attorney representing an adverse party in a lawsuit against Plaintiff (Sheindlin), and one was Plaintiff's former employee and tenant (Bassa). Plaintiff attempts to connect these Defendants by pointing out that they sometimes sought similar outcomes with respect to Plaintiff's affairs and occasionally communicated. This overlap does not come close to establishing a RICO enterprise.

Even accepting the SAC's seemingly far-fetched allegation that Larkin, Kelson, and Pine deceived Justice Onofry into appointing Pine as Plaintiff's guardian (SAC I, Dkt. 52, ¶ 73), along with the allegation that Berutti, Kelson, and Pine later sought to have Pine reappointed, these claims, at most, suggest that "various [d]efendants and subgroups agreed at different times to engage in various fraudulent schemes." *D'Addario*, 901 F.3d at 101–02. As noted, the Berutti Defendants *replaced* the Larkin Defendants as Plaintiff's counsel when "Larkin . . . quit working because of his conflict of interest." (SAC I, Dkt. 52, ¶ 144.) There thus is no suggestion in the SAC that the Larkin and Berutti Defendants were associated, let alone that they "functioned as a unit" to achieve a common purpose. *First Cap.*, 385 F.3d at 174.

The Sheindlin Defendants' only involvement with Plaintiff arose when Sheindlin represented an opposing party in a litigation against Plaintiff. (SAC I, Dkt. 52, ¶ 144; SAC II, Dkt. 52-1, ¶ 527.) Plaintiff seeks to include him in Alleged Enterprise 2 by virtue of his "attempt[] to unlawfully impose a settlement on Plaintiff" during that litigation, and because he apparently

negotiated that proposed "fraudulent" settlement with Berutti.  (SAC II, Dkt. 52-1, ¶ 492, 527.)
But the SAC does not say how this proposed settlement agreement was "fraudulent" (*id.* ¶ 492),
let alone how Sheindlin's negotiating on behalf of his own client—a party opposing Plaintiff in a
litigation—made him part of Alleged Enterprise 2.[18]

Bassa's connection to Alleged Enterprise 2 is just as tenuous.  She became involved with
Plaintiff as his employee and tenant in 2019, years after the alleged fraud perpetrated by the Larkin
Defendants, Kelson Defendants, and Pine.  And the SAC itself contradicts the notion that
Plaintiff's claims against Bassa stem from her purported role in Alleged Enterprise 2.  As the SAC
alleges, "Bassa caused damages of $105,000 for lost Airbnb guest income, theft of personal
property, lost administrative time to resolve false claims[,] and legal fees."  (SAC II, Dkt. 52-1,
¶ 524.)  These injuries have nothing to do with the fraud Plaintiff attributes to Alleged Enterprise
2.  The only conceivable connection between Bassa and the other purported members of Alleged
Enterprise 2 is the SAC's conclusory assertion that she "acted in concert with Pine, Kelson[,] and
Berutti, by composing several e-mails and sending copies of them to Judge [sic] Onofry making
utterly false statements to support of [sic] the Berutti and Kelson applications to have Pine re-
appointed as guardian for Plaintiff."  (SAC I, Dkt. 52, ¶ 195.)  But adding the words "acted in
concert" to Bassa's conduct does not sufficiently link her to Alleged Enterprise 2.  The SAC fails
to allege any facts showing how Bassa, Pine, and Kelson "functioned as a unit," or that Bassa ever
interacted with any of the other alleged members of the purported enterprise.  That her emails

---

[18] Further, the Second Circuit has clarified that "allegations of frivolous, fraudulent, or
baseless litigation activities—without more—cannot constitute a RICO predicate act."  *Butcher*,
975 F.3d at 241 (citation omitted); *cf. Curtis & Assocs., P.C. v. L. Offs. of David M. Bushman,
Esq.*, 758 F. Supp. 2d 153, 173 (E.D.N.Y. 2010) (rejecting as "absurd" Plaintiff's similar argument
in a previous case that this type of "litigation activity" by opposing counsel could give rise to a
RICO claim), *aff'd sub nom. Curtis v. L. Offs. of David M. Bushman*, Esq., 443 F. App'x 582 (2d
Cir. 2011) (summary order).

aligned with what Berutti and Kelson told Justice Onofry does not suggest the three were part of an association, but merely that they shared arguably similar views and intentions with respect to Plaintiff's guardianship proceeding.  The SAC alleges no facts to support the assertion that Bassa and these other Defendants "acted in concert," let alone that this one instance of Bassa's joint or coordinated action with Pine, Berutti, and Kelson made her part of Alleged Enterprise 2.

As to Saltiel, the SAC asserts that he "joined" Kelson, Pine, and Berutti "in their fraudulent scheme to liquidate [t]he Brooklyn Property by preventing Plaintiff from obtaining possession of it against the instruction and desires of Plaintiff."  (SAC I, Dkt. 52, ¶ 159.)  In support, Plaintiff alleges that "Berutti, Pine[,] and Saltiel engaged in a lengthy phone conference, upon information and belief, to plan the liquidation of [t]he Brooklyn Property."  (SAC II, Dkt. 52-1, ¶ 533N.)  But in addition to failing to specify what about Saltiel's efforts to liquidate the Brooklyn Property were "fraudulent," Plaintiff does not allege any facts from which to infer that Saltiel functioned as part of a unit with the purported members of Alleged Enterprise 2.  As the SAC admits, the court appointed Saltiel as Receiver and manager of the Brooklyn Property.  That he conversed with Plaintiff's guardian and attorney about potentially selling that property establishes that he carried out his court-appointed function, albeit, in a way to which Plaintiff objected; it does nothing to suggest that he joined an enterprise bent on taking Plaintiff's assets by deceiving the state court in a guardianship proceeding.

Ultimately, Plaintiff relies on the communications between his Article 81 representatives and the various other Defendants in an attempt to link them all in an association.  But the SAC fails to bear this out.  Although Pine and Kelson interacted with the Larkin Defendants, the Berutti Defendants, and on one occasion Saltiel, these interactions occurred only because Pine and Kelson were Plaintiff's court-appointed representatives and needed to communicate with these people in

conducting Plaintiff's affairs.  Even if this representation came about through deception, that does not mean everyone with whom the representatives subsequently interacted thereby became part of the scheme to deceive.  Nor does the broad purpose Plaintiff attributes to Alleged Enterprise 2— taking his property and assets—establish that everyone who allegedly mismanaged Plaintiff's property thereby joined a unified RICO enterprise.  Even crediting its largely conclusory allegations, the SAC, at most, suggests that "various [d]efendants and subgroups agreed at different times to engage in various fraudulent schemes," which is insufficient to state a claim. *D'Addario*, 901 F.3d at 101–02.

Further, even if Plaintiff alleged a coordinated enterprise, he fails to plead that Alleged Enterprise 2 "exist[ed] 'separate and apart from the pattern of activity in which it engage[d].'"  *Id.* at 99 (quoting *Turkette*, 452 U.S. at 583).  The SAC does not "detail [a] *course* of fraudulent or illegal conduct separate and distinct from the alleged predicate racketeering acts themselves." *First Cap.*, 385 F.3d at 174 (citation omitted).  Again, even construing the SAC in the most liberal possible light, Alleged Enterprise 2 is an assortment of individuals who crossed paths during Plaintiff's Article 81 proceeding and who purportedly sought to use Plaintiff's incapacity to "liquidat[e] [his] real property" and "tak[e] [his] money."  (SAC II, Dkt. 52-1, ¶ 515.)  Nothing in the SAC suggests that Alleged Enterprise 2 has an identity apart from that single scheme.  *Cf. Barker v. Rokosz*, No. 19-CV-514 (KAM) (SMG), 2020 WL 32429, at *12 (E.D.N.Y. Jan. 2, 2020) ("Nothing in the complaint actually supports the inference that the defendants associated with one another or engaged in the 'fraudulent equity-stripping scheme' either before or after their transaction with the plaintiff.  [The] [p]laintiff merely alleges that [the] defendants directly and indirectly crossed paths on one occasion with respect to the Mortgage Loans at issue."); *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 263 (S.D.N.Y. 2011) (dismissing a RICO claim that

did not "allege that [the] [d]efendants existed as an association-in-fact separate and apart from the alleged RICO activity, but rather that [they] came together strictly for the purpose of creating [] allegedly fraudulent tax shelters").[19]

> b. Plaintiff Fails to Adequately Plead that Alleged Enterprise 2 Engaged in a Pattern of Racketeering Activity

Even if the SAC sufficiently alleged that Alleged Enterprise 2 constituted an enterprise and one that was separate from the alleged racketeering acts, the SAC fails to plead that Alleged Enterprise 2 engaged in a pattern of racketeering activity. Although Plaintiff labels numerous mailings and communications as separate predicate acts, he ultimately alleges a single fraudulent act to deceive the state court into appointing a guardian so Alleged Enterprise 2 could take his property and assets. Once the court found that Plaintiff was incapacitated and appointed Pine (the result of the alleged fraud), Alleged Enterprise 2 began to reap the benefits of its purported misconduct (taking Plaintiff's assets without his interference). But the only alleged misrepresentation concerned Plaintiff's incapacity and recovery. This alleged fraud, in turn, was limited to a single victim (Plaintiff) with a discrete pool of assets. In these respects, this case resembles *First Capital*, where the plaintiffs alleged that the defendants committed a string of fraudulent acts over several years to deprive the plaintiffs of assets in a bankruptcy proceeding. 385 F.3d at 165–66, 180. As in *First Capital*, the scheme in this case "involved the same misrepresentations" and a discrete pool of assets. *See id.* at 181–82. And the Second Circuit in *First Capital* found that this conduct did not reflect a pattern of racketeering activity because it

---

[19] *See also Edmond v. Live Well Fin., Inc.*, No. 19-CV-703 (VEC) (SN), 2019 WL 8111919, at *5 (S.D.N.Y. Dec. 2, 2019) (dismissing a RICO claim because the plaintiff failed "to allege fraudulent or illegal conduct separate and distinct from the alleged single predicate racketeering act itself—a requirement in this Circuit"), *report and recommendation adopted*, No. 19-CV-703 (VEC) (SN), 2020 WL 64747 (S.D.N.Y. Jan. 6, 2020).

was "inherently terminable." *Id.* at 180–81 (citation omitted). Plaintiff thus fails to allege

continuous conduct that could constitute a pattern of racketeering activity by Alleged Enterprise

2.[20]

       c.   Plaintiff Fails to Adequately Plead a RICO Conspiracy by Alleged
            Enterprise 2

Plaintiff's RICO conspiracy count with respect to Alleged Enterprise 2 also fails to state a

claim. The Section 1962(d) allegations are substantively identical to the Section 1962(c)

allegations except that they assert that certain Defendants conspired with each other to achieve the

alleged outcomes. (*See* SAC II, Dkt. 52-1, ¶¶ 520A–K, 527–532, 532A–K.) Because "[t]he

alleged conspiracy involved an agreement to commit the same substantive RICO violations [the

---

[20] The Larkin Defendants also argue that the Court should dismiss "all claims arising out of the Larkin Defendants' commencement of the Guardianship Proceeding" under the *Rooker-Feldman* doctrine, derived from *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). (Larkin Defendants' Memorandum of Law in Support of Motion to Dismiss ("Larkin Br."), Dkt. 96, at 9.) The *Rooker-Feldman* doctrine "instructs that district courts lack subject-matter jurisdiction over 'cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *Butcher*, 975 F.3d at 243 (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)). The Larkin Defendants contend that Plaintiff's claims arise from Justice Onofry's finding that Plaintiff was incapacitated, and thus that Plaintiff's RICO claim impermissibly challenges a state court ruling. (*See* Larkin Br., Dkt. 96, at 8–10.) But even if the Larkin Defendants are right, the Court "may assume hypothetical statutory jurisdiction in order to resolve this [case] on the merits because the *Rooker-Feldman* doctrine does not implicate Article III jurisdiction." *Butcher*, 975 F.3d at 244. "Doing so is particularly appropriate in this case, where the jurisdictional issue is both novel and arguably complex, while [Plaintiff's RICO] claims are plainly meritless." *See id.* For example, while courts have dismissed RICO claims under *Rooker-Feldman* when premised on state court judgments, "even if [those] order[s] by the state court [were] wrongfully procured," *see Huszar v. Zeleny*, 269 F. Supp. 2d 98, 103 (E.D.N.Y. 2003), the Second Circuit has cautioned that "claims sounding under [] RICO [] speak not to the propriety of the state court judgments, but to the fraudulent course of conduct that defendants pursued in obtaining such judgments," *Sung Cho v. City of New York*, 910 F.3d 639, 645–46 (2d Cir. 2018) (citation omitted). The Court elects to avoid this "arguably complex" issue given that Plaintiff's RICO claims, as explained, "are plainly meritless." *See Butcher*, 975 F.3d at 244.

Court has] deemed insufficiently pled, and [Plaintiff has] not alleged any further acts that, if carried out, would have satisfied RICO's requirement of a pattern of racketeering," the conspiracy claim also must be dismissed. *Williams*, 889 F.3d at 126; *see also Lynn*, 760 F. App'x at 54 ("Here, the alleged conspiracy was an agreement to commit the same substantive RICO violations we have deemed insufficiently pled, so there was no agreement to violate RICO's substantive provisions.").

## II.   State Law Claims

Plaintiff also alleges breach of contract, breach of fiduciary duty, common law fraud, and violations of New York General Business Law 349.  (*See* SAC II, Dkt. 52-1, ¶¶ 539–82.)  He also appears to allege a separate malpractice claim.  (*See, e.g.*, *id.* ¶¶ 571–74.)  These are all state law claims, and Plaintiff does not invoke diversity jurisdiction.

"[A] federal court has subject-matter jurisdiction over specified state-law claims, which it may (or may not) choose to exercise." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. §§ 1367(a), (c)). "A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Id.* (citing 28 U.S.C. § 1367(c)). Still, "if a plaintiff's federal claims are dismissed before trial, the state law claims should be dismissed as well." *Oneida Indian Nation of N.Y. v. Madison County*, 665 F.3d 408, 437 (2d Cir. 2011) (citation and quotations omitted).

In considering whether to exercise supplemental jurisdiction, the Court notes that, "[b]y all appearances, . . . this is a breach of contract action that Plaintiff is attempting to transform into a federal RICO case." *See Oriska Ins. Co.*, 2019 WL 4195267, at *11 (citations, quotations, and brackets omitted); *accord Faryniarz*, 62 F. Supp. 3d at 254 ("Though styled as violations of federal law, Plaintiff's proposed civil RICO claims suggest[] in substance claims for breach of contract and common business tort."). Plaintiff's Reply to Defendants' motions, for example, devotes almost no attention to the substance of the RICO pleadings, instead focusing on the state law claims

and various procedural issues.  (*See generally* Pl. Resp., Dkt. 85.)  The Court declines to exercise

supplemental jurisdiction over Plaintiff's state law claims.[21]

---

[21] The Saltiel Defendants and Greenberg Defendants also move for sanctions under Federal Rule of Civil Procedure 11.  The Saltiel Defendants argue that Saltiel, a court-appointed Receiver, is immune from suit, and thus that the claims against him are frivolous.  (*See* Dkt. 108.)  The Greenberg Defendants argue that the claims against them are frivolous on the merits.  (*See* Dkt. 110.)  In addition to dismissal, the Saltiel Defendants and Greenberg Defendants seek attorneys' fees as a sanction.  "An attorney may be subject to sanctions under Rule 11 for presenting frivolous claims in a pleading."  *Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 177 (2d Cir. 2012) (citing Fed. R. Civ. P. 11(b)(2) and (c)).  "The standard for triggering the award of fees under Rule 11 is objective unreasonableness and is not based on the subjective beliefs of the person making the statement."  *Id.* (citation and brackets omitted).  "With respect to legal contentions, the operative question is whether the argument is frivolous, i.e., the legal position has no chance of success, and there is no reasonable argument to extend, modify or reverse the law as it stands."  *Id.* (citation, quotations, and brackets omitted).  "Even if the district court concludes that the assertion of a given claim violates Rule 11, [] the decision whether or not to impose sanctions is a matter for the court's discretion."  *Perez v. Posse Comitatus*, 373 F.3d 321, 325 (2d Cir. 2004).  Plaintiff alleges in the SAC that he is entitled to sue Saltiel under 28 U.S.C. § 959(a) (*see* SAC I, Dkt. 52, ¶ 164), which "states that 'Receivers may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in *carrying on business* connected with such property," *Baron v. Vullo*, 699 F. App'x 102, 104 (2d Cir. 2017) (summary order) (quoting 28 U.S.C. § 959(a) (alterations omitted)).  He also notes in his response to the Saltiel Defendants' motion for sanctions that he has since requested that the state court revoke any immunity Saltiel may have, and, although the state court denied that request, it noted that it did not have authority to decide the matter.  (*See* Dkt. 113, at ECF 4.)  Although the Saltiel Defendants may be right that Plaintiff's suit would be subject to dismissal on immunity grounds, the Court cannot find, based on the record, that Plaintiff should be subject to sanctions for his legal assertions.  Similarly, with respect to the Greenberg Defendants, the Court cannot find that Plaintiff's "legal position has no chance of success, and there is no reasonable argument to extend, modify or reverse the law as it stands."  *Star Mark*, 682 F.3d at 177 (citation, quotations, and brackets omitted).  The motions for sanctions therefore are denied.

## CONCLUSION

Defendants' motions to dismiss are granted.  Plaintiff's 18 U.S.C. §§ 1962(c) and 1962(d) claims are dismissed with prejudice against all Defendants.  Plaintiff's state law claims are dismissed without prejudice against all Defendants.  Defendants Saltiel's and Greenberg's motions for sanctions are denied.  The Clerk of Court is respectfully directed to enter judgment accordingly and close this case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated:  September 23, 2021
        Brooklyn, New York